# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-1534V

| | |
|---|---|
| ROBERT M. ANDERSON, JR., | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 27, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Scott B. Taylor*, Urban & Taylor, S.C., Milwaukee, WI, for Petitioner.

*Elizabeth Andary*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION AWARDING DAMAGES**[1]

On September 6, 2023, Robert M. Anderson, Jr., filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on January 12, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. The parties could not agree to damages, and their dispute was therefore submitted to resolution at an expedited proceeding on October 24, 2025.

For the following reasons, I find that Petitioner is entitled to compensation, and I award damages for actual pain and suffering of $133,000.00.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**I.      Procedural History**

The case was assigned to the SPU in January 2024. ECF No. 9. On May 6, 2024, Respondent filed a Rule 4(c) Report conceding entitlement to compensation. ECF No. 17 ("Rule 4(c) Report"). On May 9, 2024, I entered a Ruling on Entitlement in Petitioner's favor. ECF No. 19. In July 2024, the parties indicated that they had reached an impasse in damages negotiations and this matter was set on a briefing schedule. On November 4, 2024, the parties filed simultaneous briefs ("Pet'r Br." and "Resp't Br.").[3] ECF Nos. 30, 31. The parties filed simultaneous response briefs on December 4, 2024 ("Pet'r Resp. Br." and "Resp't Resp. Br."). ECF Nos. 32, 33. On October 8, 2025, I set this matter for an expedited hearing.

At the end of the October 24, 2025 hearing, I issued an oral ruling from the bench on damages. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed on the case's docket (but is fully incorporated into this Decision).

**I.      Factual Findings**

Petitioner was 37 years old at the time of vaccination. He was (and still is) incarcerated by the State of Wisconsin. In approximately 2001 (before he went to prison), Petitioner was hospitalized with several gunshot wounds, including one in the "right brachium." Ex. 3 at 42, 304, 322. However, Petitioner's medical records from before the vaccination do not contain any complaints of pain caused by this past injury. Rule 4(c) Report at 2; Resp't Br. at 2.

Petitioner's only health issues prior to vaccination stemmed from being overweight. Petitioner was undergoing testing for his cholesterol and blood sugar through the prison health center. Ex. 3 at 45, 47, 104, 305. He had recently been prescribed metformin and was given permission to use an exercise bicycle twice per week. *See id.* Petitioner also had been receiving physical therapy ("PT") for low back pain. *Id.* at 294.

Petitioner received the flu vaccine in his right arm on January 12, 2021.[4] Ex. 1 at 2. On January 14, 2021, when he was using his exercise bicycle time, he reported to the

---

[3] Petitioner made this filing in the form of a separate motion for ruling on the record (ECF No. 29) and brief (ECF No. 30).

[4] On January 11, 2021, Petitioner submitted a Health Service Request ("HSR") form asking to receive a flu shot. Ex. 3 at 727. Respondent notes that Petitioner also received a flu vaccine in his left arm on October 22, 2020, less than three months earlier. Resp't Br. at 2 n.1 (citing Ex. 3 at 23, 391). It is unclear why Petitioner requested another flu shot, although Respondent implies that Petitioner was seeking out a way to claim a SIRVA.

2

prison physical therapist that he had right shoulder pain. Ex. 3 at 305. The physical therapist demonstrated to Petitioner a "passive ROM program" to maintain mobility. *Id.*

On January 20, 2021, Petitioner submitted an Heath Service Request ("HSR") form about right shoulder pain. *Id.* at 726. He was seen by a prison nurse the next day. *Id.* at 94. The nurse told him to use Tylenol/ibuprofen and a muscle rub and wrote him an order for ice.[5] *Id.*

Petitioner then submitted two HSRs and a note stating that he could not lift his right arm, that his pain had gotten worse, and asking if he could have PT for his shoulder. *Id.* at 719, 721, 723. Petitioner saw a prison nurse on February 4, 2021. *Id.* at 89. The nurse told him again to use the muscle rub and Tylenol/ibuprofen and also to put a warm, moist towel on his arm. *Id.* The nurse also instructed him to keep moving his right shoulder to prevent stiffness. *Id.* Petitioner needed to be assessed by one of the prison doctors before he could receive PT. *See id.* at 117.

On February 8, 2021, Petitioner saw physician Justin Ribault. Dr. Ribault was skeptical of Petitioner's complaints about his right shoulder and wrote that Petitioner had "non-specific" pain, "likely from a self-injury." *Id.* at 44. Dr. Ribault ordered an ultrasound and stated that Petitioner should wait until after it was completed before going to PT. *Id.* Petitioner had the ultrasound on February 17, 2021, and it was normal. *Id.* at 115. Dr. Ribault prescribed PT on February 23, 2021. *See id.*

Petitioner submitted HSR forms on February 11, 2021, February 25, 2021, and March 8, 2021, regarding his right shoulder pain. *Id.* at 712, 714, 716. Petitioner repeatedly asked for information about when he could go to PT. *See id.* He also stated that Tylenol/ibuprofen/aspirin and using the warm towel were not helping his pain. *See id.*

Petitioner had his first PT appointment on March 16, 2021. *Id.* at 289. Petitioner reported up to 10/10 pain. *Id.* The physical therapist observed ROM limitations and noted that Petitioner possibly was in the freezing stage of adhesive capsulitis. *Id.* The physical therapist ordered a TENS unit and gave Petitioner a home exercise plan ("HEP"). The physical therapist also suggested that Petitioner could be referred for a cortisone shot. *Id.* Petitioner was scheduled for PT twice per month for 12 weeks. *Id.*

On March 23, 2021, Petitioner submitted an HSR form and a separate note about his ongoing right shoulder pain. *Id.* at 704, 707. He was seen by a prison nurse the next

---

[5] Due to the institutional environment, Petitioner had to see a member of the medical staff to receive even non-prescription medication. He also needed permission to obtain items like ice or an extra blanket/pillow to prop his shoulder while sleeping.

day.[6] *Id.* at 86. It appears that one of the prison medical staff put in an order for a cortisone injection on April 21, 2021. *Id.* at 113. However, he did not receive a cortisone injection at this time.

Petitioner had two more PT appointments -- on April 6, 2021, and April 27, 2021. *Id.* at 283. On May 3, 2021, Petitioner had an x-ray on his right shoulder, which was necessary to be seen by an orthopedist. *See id.* at 113. The x-ray was normal. *Id.* at 251, 366.

Petitioner submitted several HSR forms in April-June 2021 complaining about his pain and asking when he could get the cortisone injection because his arm pain was severe and he had limited mobility. *Id.* at 33, 690, 695, 696, 698. Petitioner was seen by prison nurses on May 10, 2021, May 17, 2021, and June 21, 2021. *Id.* at 73, 76, 81. Petitioner described a sharp, pulling pain that he rated 7/10. *See id.* The prison nurses told Petitioner to keep taking Tylenol/ibuprofen and do his home exercises. *See id.* It also appears that the physical therapist decided not to work with Petitioner further until he received the cortisone injection. *See id.* at 73.

On July 2, 2021, Petitioner was taken to orthopedist Dr. Edward Riley outside of the prison. *Id.* at 283. Dr. Riley examined Petitioner and noted his past gunshot wound. *Id.* Petitioner informed Dr. Riley that he had recovered well from this injury, but ever since then he had had an asymmetric posture and leaned to the right. *Id.* Dr. Riley agreed to administer a cortisone injection and stated that it would not be an "unreasonable intervention," but would likely not help very much unless Petitioner put in substantial effort to improve his posture. *Id.*

On July 6, 2021, Petitioner requested to resume PT. *Id.* at 688. Petitioner had PT sessions on July 13, 2021, and July 27, 2021. *Id.* at 278, 281. Petitioner's pain and ROM had improved following the cortisone injection (although he still rated his pain 5/10). *See id.* At the July 27, 2021 session, the physical therapist stated that they would have a follow-up appointment in four weeks.[7] *Id.* at 278. However, Petitioner did not receive any more PT sessions until March 2022.

On August 12, 2021, Petitioner was seen by a prison nurse regarding his right shoulder pain. *Id.* at 70. At this appointment, Petitioner reported that the cortisone injection was wearing off. *Id.* Petitioner also saw a prison nurse on October 18, 2021, and

---

[6] In particular, Petitioner stated that he had extreme pain that caused difficulty sleeping and had stopped taking his metformin because he believed that he could not mix it with Tylenol. Ex. 3 at 704.

[7] At this session, the physical therapist also reminded Petitioner to be more adherent with the HEP and that he needed to do the exercises daily. *Id.* at 278.

stated that naproxen did not help his pain. *Id.* at 68. Petitioner also stated that he was unable to lift his arm over his head. *Id.*

On October 19, 2021, Petitioner saw prison physician Ahmed Haseebuddin. *Id.* at 52. Petitioner reported a throbbing pain that was 6/10 and worse at night and with movement. *Id.* Petitioner had a reduced ROM. *Id.* Dr. Haseebuddin ordered an MRI to "rule out any arthritis, tendinitis, or tear." *Id.* Dr. Haseebuddin also prescribed cyclobenzaprine. *Id.*

On November 15, 2021, Petitioner was seen by a prison nurse. *Id.* at 66. Petitioner complained that he was supposed to have the cyclobenzaprine for 21 days (or until he could have an MRI) but had only received it for three days. *Id.* The nurse followed up with Dr. Ribault. *Id.* at 10. Dr. Ribault stated that Petitioner had adhesive capsulitis, which did not require any imaging, and that Petitioner needed to improve his posture and exercise routine. *Id.* It appears that Dr. Ribault cancelled Petitioner's MRI order. *See id.* at 10, 571.

Petitioner was seen by prison nurses on November 24, 2021 and December 23, 2021. *Id.* at 55, 58-59. Petitioner complained of 8/10 right shoulder pain and that the cortisone injection had worn off. *See id.*

On January 10, 2021, Petitioner was seen by Dr. Ribault. *Id.* at 42. Petitioner stated that he was doing exercises with a therapy band once per day. *Id.* Dr. Ribault discussed Petitioner's old gunshot wound and "noted that past trauma can be associated with current symptoms as his shoulder did not necessarily heal after the trauma." *Id.* Dr. Ribault also stated that Petitioner "had likely given himself a frozen shoulder." *Id.* at 43. However, Dr. Ribault did reinstate the order for Petitioner to undergo an MRI. *Id.*

Petitioner submitted an HSR form on March 6, 2022 and was seen by a prison nurse the next day. Ex. 6 at 27, 138. Petitioner complained that his ibuprofen had been discontinued. *Id.* at 27. Dr. Ribault ordered more ibuprofen. *Id.* at 29.

Petitioner underwent the MRI at a nearby hospital on March 2, 2022. Ex. 5 at 6. The radiologist's impressions were: "1) Supraspinatus and infraspinatus tendinosis with low-grade partial-thickness tearing of the supraspinatus. Cystic change in the anterior aspect of the greater tuberosity likely reflects sequelae of insertional tendinopathy as well. 2) Mild acromioclavicular joint degeneration." *Id.*

Petitioner submitted an HSR form on March 3, 2022, asking when he would be able to see the physical therapist. Ex. 6 at 135. Petitioner reported between 5/10 and 10/10 pain. *Id.* Petitioner was told that he had just had imaging and that he had a PT

appointment scheduled for the next week. *Id.*

Petitioner submitted additional HSR forms in March-July 2022 and was scheduled for appointments with prison nurses as a result. *See id.* at 18-19, 122, 125, 127, 130; Ex. 7 at 61, 63, 300, 302, 306, 307. Petitioner repeatedly complained of severe pain and his shoulder locking up and requested additional treatment. *See id.* He was told to keep using ice, Tylenol/ibuprofen, prop his shoulder at night using an extra blanket/pillow, and perform his HEP exercises. *See id.*

Petitioner had PT sessions on March 8, 2022, March 22, 2022, April 19, 2022, and June 8, 2022. Ex. 6 at 43, 46, 50, 52. At the June 8, 2022 session, the physical therapist stated that they had allowed the supraspinatus tendon time to remodel and Petitioner had had some ROM improvement, but his pain had not improved. *Id.* at 43. Petitioner and the physical therapist agreed to discharge Petitioner from PT and refer him for further evaluation. *See id.*

On June 29, 2022, Petitioner had an appointment with orthopedist Dr. Riley. Ex. 7 at 139. Dr. Riley stated that Petitioner had worked hard in PT and had improved his posture and right shoulder ROM. *Id.* However, his right shoulder hurt when moved and made it difficult to exercise in order to control his diabetes. *Id.* Dr. Riley told Petitioner that his options were to live with the pain and that it might slowly improve, or he could undergo a diagnostic arthroscopy. *Id.* Dr. Riley warned that the operation might not help with Petitioner's pain but it was possible that they would find a treatable pathology. *Id.* Petitioner decided to move forward with the surgery. *Id.*

On July 31, 2022, Petitioner submitted an HSR form complaining that his shoulder had not gotten better and that he had "searing" pain. *Id.* at 302. He also indicated that meloxicam, Tylenol, and the muscle rub were not working. *Id.* Petitioner was seen by a prison physician Shirley Godiwalla on August 10, 2022. *Id.* at 20. Dr. Godiwalla administered an injection of Toradol in Petitioner's right subacromial bursa. *Id.* It appears that Petitioner agreed to trial injections with the physician before undergoing the arthroscopy. *See id.* However, Petitioner did not receive any further injections because the doctor was "unavailable to administer" them. *Id.* at 299.

Petitioner had two more PT appointments -- on August 11, 2022, and August 25, 2022. *Id.* at 112, 123. Petitioner at first reported relief from the Toradol injection. *Id.* at 127. However, by August 25, 2022, he indicated that his pain had returned. *Id.* at 112. At this point, Petitioner seems to have been approved for surgery, but it still needed to be scheduled. Petitioner and the physical therapist agreed that he would continue doing his HEP to prepare for surgery and would not have further PT until afterwards. *See id.*

Petitioner submitted multiple HSRs in August, October, and November 2022 complaining about his pain, which he described in severe terms. *Id.* at 69, 283, 284, 287, 288, 289, 291, 298. Petitioner requested additional treatment and help. *See id.* Petitioner was seen by prison nurses on August 24, 2022, October 3, 2022, and October 17, 2022 but was generally told to wait for his surgery. *See id.* at 53, 56, 59.

On November 11, 2022, Petitioner underwent surgery. *Id.* at 64, 130. Dr. Riley performed a right shoulder arthroscopic subacromial decompression, distal clavicle excision, and limited debridement of the glenohumeral joint, including superior labrum, rotator cuff, and synovitis. *Id.* at 130. Dr. Riley's post-operative diagnosis was "chronic subacromial bursitis. Severe acromioclavicular osteoarthritis. Synovitis glenohumeral joint. Partial thickness rotator cuff tear. Degenerative fraying superior labrum." *Id.* Petitioner had several visits with the prison nurses in the two weeks post-surgery to check his progress and for wound care. *Id.* at 31, 34, 37, 39, 45, 48, 63. Petitioner stated that he still had pain and was ordered Tylenol/ibuprofen and ice.[8] *See id.*

Petitioner had his first post-op PT sessions on November 22, 2022. *Id.* at 118. Unlike previously, Petitioner was given more PT – once per week – along with continuing to perform his HEP. Petitioner had five post-op PT sessions between November 22, 2022 and December 28, 2022. *Id.* at 108, 112, 113, 116, 118. Petitioner was at first pleased with the surgery, but by December 1, 2022 was frustrated that he was still having pain. *See id.* at 116-118. Petitioner also reported new numbness in his right thumb. *Id.* at 26.

On December 30, 2022, Petitioner had a post-op follow-up appointment with Dr. Riley. *Id.* at 128. Petitioner reported a "mild/moderate" pain that was different from pre-op and felt that his ROM was "pretty good." *Id.* Dr. Riley stated that he had a "satisfactory post op course." *Id.* Dr. Riley also stated that the thumb numbness was likely related to the interscalene block and would eventually resolve. *Id.*

Petitioner had three more post-op PT sessions in January-February 2023. Ex. 8 at 126-132. Petitioner reported that his ROM had improved but believed that his pain was worsening. *See id.* Additionally, Petitioner continued to submit HSR forms about severe right shoulder pain that he rated between 6/10 and 10/10 (sometimes mentioning left shoulder pain as well) and was seen by prison nurses on December 20, 2022, January 19, 2023, February 6, 2023, February 14, 2023, February 21, 2023, and March 1, 2023.[9]

---

[8] Around November 17, 2022, Petitioner also began reporting sharp pain in his *left* shoulder from a COVID-19 vaccine. *See* Ex. 7 at 63.

[9] Petitioner received a flu shot in his *left* arm on February 28, 2023 and immediately began complaining of SIRVA-like symptoms, in addition to his ongoing complaint about the COVID-19 vaccine.

Ex. 7 at 26, 268; Ex. 8 at 37, 39, 42, 47, 50, 254, 257, 260, 264.

Petitioner transferred to a different prison in early March 2023. Ex. 8 at 229. At the new facility, he continued to submit HSR forms about pain in both shoulders and had two nurse appointments. *Id.* at 30, 34, 247, 248, 250. One of the nurses noted that Petitioner had been lifting weights and doing pushups. *See id.* at 30-31. Petitioner was told not to do that kind of exercise until he had seen the orthopedist again, but to keep doing the PT ROM exercises. *See id.*

On April 18, 2023, Petitioner was seen offsite at the orthopedic surgery clinic at Gunderson Lutheran Medical Center ("Gunderson"). *Id.* at 141-144. Petitioner had an appointment with a physician assistant ("PA"). *See id.* Petitioner rated his pain 6/10 and stated that it was like how it was before surgery. *Id.* The PA noted that Petitioner had done "extensive therapy" without relief. *Id.* The PA "[did] not think at this time there is any surgical management that could improve his symptoms. He might just have to undergo occasional injections or consistent oral anti-inflammatories to help with the symptoms." *Id.* Petitioner received a cortisone injection at this appointment. *Id.*

Petitioner had PT sessions at his new facility approximately once per week between April 6, 2023 and June 29, 2023. Ex. 8 at 106-124. The notes for some of these sessions also discussed his lower back pain and left shoulder pain, in addition to the ongoing post-surgical right shoulder pain. *See id.*

On June 27, 2023, Petitioner had an offsite appointment with orthopedist Steven Klein at Gunderson. *Id.* at 136. Dr. Klein noted that Petitioner had failed to have adequate relief from his symptoms following surgery. *Id.* Petitioner also did not have relief from the previous steroid injection. *Id.* Dr. Klein found "mildly positive" impingement signs. *Id.* Dr. Klein concluded that Petitioner would not receive any benefit from another surgery and referred him to physical medicine and rehabilitation for pain management. *Id.*

Petitioner was seen by prison nurses for both right and left shoulder pain on July 10, 2023, August 17, 2023, and September 13, 2023. *Id.* at 19-22. At the September 13th visit, the nurse expressed skepticism about Petitioner's left shoulder pain claim. *See id.* at 20. The nurse wrote that Petitioner seemed to be an "unreliable historian" and was inconsistent in reporting which shoulder was affected. *Id.* In particular, she described how Petitioner made comments about his right shoulder, but when she clarified which shoulder was causing pain, he switched to saying it was his left shoulder. *Id.* The nurse also noted that Petitioner made hand gestures or pointed at things without any indication of pain or discomfort. *Id.*

On December 5, 2023, Petitioner returned to Gunderson and saw a different PA for bilateral shoulder pain. Ex. 9 at 84. Petitioner stated that his right shoulder pain was still present in the AC join and bursa and described the pain as "achy." *Id.* The PA determined that a steroid injection in the AC joint could be helpful, but Petitioner did not receive it at this time. *Id.* The PA suggested Voltaren gel. *Id.* Petitioner also received an assessment of his left shoulder and an order for imaging. *Id.*

Petitioner submitted HSR forms on December 22, 2023, and December 28, 2023, about his right shoulder pain, which he felt was getting worse and was 5/10. *See id.* at 31, 32. He received a nurse visit on December 29, 2023. *Id.* at 4. At this appointment, Petitioner reported difficulty sleeping at night due to the pain. *Id.* The nurse ordered an extra pillow. *Id.* Petitioner also discussed his left shoulder at this appointment. *See id.*

On February 7, 2024, Petitioner received an AC joint steroid injection at Gunderson. *Id.* at 75. Petitioner was seen by a prison nurse on February 25, 2024, and reported that his right shoulder was better, although he was still complaining of left shoulder pain. *Id.* at 3.

Petitioner had a follow-up appointment for both shoulders at Gunderson on February 28, 2024. *Id.* at 71. He reported "great relief" following the steroid injection for his right shoulder. *Id.* However, Petitioner continued to complain of left shoulder pain and stated that it was worsening. *Id.*

Petitioner did not file any additional records. Petitioner's affidavit is dated August 28, 2023, and largely repeats the allegations in the Petition. *See* Ex. 2 at 1-13. In Petitioner's damages brief, Petitioner's counsel avers that he had a conversation with his client in "early April 2024" in which Petitioner indicated that although the recent steroid injection did help with the pain, he still has residual pain with activity and stiffness while at rest. *See* Pet'r Br. at 18-19. Petitioner's counsel also relates that Petitioner has returned to some normal activities, but can no longer lift weights. *See id.*

## II.   Damages

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related

9

injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[10]

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

As explained at the October 24, 2025 hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. The parties should look to the general landscape of past pain and suffering awards, and specific past reasoned decisions that they believe to be directly "on point," when presenting their specific valuations of a case that is formally in damages. That information, when offered by the parties, can be highly useful in guiding my award (although a petitioner's personal circumstances are always the primary foundation of the award ultimately issued).

Petitioner seeks a pain and suffering award of $140,000.00 to $150,000.00. Pet'r Br. at 1, 24-26. In support of his proposed award, Petitioner cites *Amor* ($130,000.00), *McKay* ($127,500.00),[11] *Blanco* ($135,000.00), and *Reed* ($160,000.00).[12] Petitioner argues that his injury and treatment are worse than in *Amor*, *McKay*, and *Blanco*, meriting

---

[10] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[11] Petitioner's brief incorrectly states that the McKay petitioner was awarded $135,000.00 for pain and suffering. *See* Pet'r Br. at 23.

[12] *Amor v. Sec'y of Health & Hum. Servs.*, No. 20-0978V, 2024 WL 1071877 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *McKay v. Sec'y of Health & Hum. Servs.*, No. 21-0071V, 2023 WL 9231565 (Fed. Cl. Spec. Mstr. Dec. 11, 2023); *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

a higher award, but somewhat less than in *Reed*. *Amor*, *McKay*, and *Blanco* are indeed appropriate comparators, but there is no basis for finding Petitioner's circumstances to be significantly more severe. For the reasons stated below, I will award $133,000.00, which is in the range presented by these three cases.

Petitioner's course of treatment was more complicated than in *Amor*. That petitioner went straight to an orthopedist complaining of right shoulder pain 23 days after vaccination. The orthopedist provided her with a cortisone injection at this first appointment. Over the next several months, the *Amor* petitioner had appointments with the orthopedist about her shoulder and also early onset osteoarthritis with multiple joint involvement, in which she received more cortisone injections. Approximately 18 months after vaccination, the *Amor* petitioner reported that her pain was getting worse (rating it 6/10) and received her final cortisone injection, for a total of five. The orthopedist then performed arthroscopic surgery with debridement, decompression, evacuation of calcium deposits, and partial distal claviculectomy. The *Amor* petitioner engaged in eight post-op PT sessions. Post-surgery, she was found to have made excellent progress and was pain-free most of the time, albeit with some lingering limitation to her right shoulder function.

Petitioner's injury appears to have been less easily resolved. The *Amor* petitioner received more cortisone injections (perhaps due to the orthopedist's personal practice) but Petitioner still received three, more than in a mild SIRVA case. Petitioner also received a Toradol injection and would have had a series of these injections, if not for the unavailability of the prison physician. Petitioner had many more PT sessions, consistently complained of severe pain, and his course of treatment lasted longer. Importantly, the *Amor* petitioner had a positive surgical outcome, whereas Petitioner still struggled with significant pain for at least another year after surgery, as evidenced by his third cortisone injection in February 2024. An award of more than $130,000.00 would thus be warranted in the instant case.

Petitioner's injury and treatment were also more severe than in *McKay*. In *McKay*, the petitioner complained of right shoulder pain shortly after vaccination, but only used over-the-counter pain medication, muscle relaxers, and home exercises for about four months. She eventually went to an orthopedist, received an MRI, and was given the suggestion of surgery. However, the petitioner was apprehensive about surgery and instead attempted conservative treatment of home exercises and a cortisone injection for another few months. When her symptoms did not improve and another MRI showed more damage, the petitioner underwent surgery over a year and a half post-vaccination. The petitioner recovered well from the surgery and was generally pain-free, but with some limitations to ROM. She had seven post-op PT sessions, but was noted to be non-compliant with her HEP and declined the recommended frequency of sessions.

11

In comparing the instant case to *McKay*, Petitioner participated in a much greater number of PT sessions, including pre-operative PT, and received lengthier conservative treatment, including more steroid injections. Petitioner also did not have a successful surgical outcome. *McKay* demonstrates that Petitioner's award here should not be below $130,000.00.

*Blanco* has some factual distinctions, but is also still a useful comparator. The *Blanco* petitioner reported pain less than a month after vaccination and underwent "significant treatment" for over two years. She had between 23 to 44 PT sessions, massage therapy, four steroid injections, acupuncture, three MRIs, and an arthroscopic surgery. The *Blanco* decision notes that the petitioner's records evidenced a "fairly severe injury" and she underwent a "significant surgical procedure." However, the *Blanco* petitioner made "substantial recovery" after her surgery and additional PT. Although Petitioner did not recover well and his treatment duration was lengthier, the *Blanco* petitioner did have more intense treatment overall and a seemingly more severe injury. In balancing these factors, I will award slightly less than the $135,000.00 set forth in *Blanco*.

Petitioner's circumstances are less severe than in *Reed*, as he appears to acknowledge. There are some similarities in that both petitioners immediately and consistently reported high levels of pain and shoulder immobility. Both petitioners also had a rather lengthy course of treatment and did not have much improvement after surgery.[13] However, unlike in the instant case, the *Reed* petitioner ended up on long-term opioid pain medication through a pain management doctor, whereas Petitioner did eventually report that his shoulder was better. Further, the *Reed* petitioner described physical difficulty in caring her son and grandchildren and "significant disruptions of her ability to work, care for her family, and enjoy recreational activities." Petitioner has not provided this kind of testimony here.

By contrast, Respondent recommends a far lower award of no more than $100,000.00, relying on *Hunt* and *Shelton*, which awarded $95,000.00 and $97,500.00 respectively. Respondent also points to *Martin* as a factually similar case, in which the petitioner received $100,000.00.[14] Resp't Br. at 9-11. I do not find Respondent's

---

[13] It is unclear how many PT sessions the Reed petitioner had overall, but she had 18 post-op sessions. She also tried a trigger point injection without success.

[14] *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021); *Martin v. Sec'y of Health & Hum. Servs.*, No. 19-830V, 2021 WL 2350004 (Fed. Cl. Spec. Mstr. May 5, 2021).

recommendation to be commensurate with the level of pain and duration of treatment that Petitioner experienced.

Respondent's reliance on *Hunt* and *Shelton* is not persuasive. Several decisions have recognized that these cases are outliers. Respondent does not address why *Hunt* and *Shelton* awarded relatively low amounts in pain and suffering, but those facts underscore why they are poor comparisons. The *Hunt* petitioner had periods without any pain, and the *Shelton* petitioner had a long initial treatment gap.

Further, Respondent's comparison to *Martin* is misplaced. There are numerous differences between *Martin* and the instant case. In *Martin*, the petitioner's initial post-vaccination symptoms were significant, but his pain was only ever described as mild and did not affect his sleep. There was a period of 18 weeks in which the petitioner did not seek any treatment and he only received a single cortisone injection. Even though the *Martin* petitioner did undergo surgery, he made a strong and relatively quick recovery and could do pushups and golf less than three months after surgery. He had 16 post-op PT sessions and was largely recovered by 12 months post-vaccination. *Martin* represents the most mild variety of SIRVA cases involving one surgical procedure.

Respondent's other arguments incorrectly attempt to downgrade and diminish the record evidence. Respondent argues that Petitioner's symptoms were "not of the severity that is typically seen in surgery cases." Resp't Br. at 8. Respondent points to the July 2, 2021 appointment with Dr. Riley in which Petitioner was noted to have "full or near-full" ROM. *Id.* However, this argument is belied by Petitioner's numerous HSR forms requesting medical attention and his other treatment records documenting pain and limited ROM. Petitioner's description of his pain and difficulty moving his shoulder is not distinct from *Amor*, *Blanco*, or even *Reed*.

Respondent also puts great emphasis on Dr. Riley's observation that Petitioner's gunshot wound left him with an asymmetric posture.[15] *Id.*; Resp't Resp. Br. at 3-4. Respondent thus contends that Petitioner's old gunshot wound and poor posture contributed to his symptoms or "affected his treatment course." Resp't Br. at 10-11. In this manner, Respondent attempts to distinguish Petitioner's comparators by stating that none of those cases involved any "documented prior history or injury to the vaccinated arm." Resp't Resp. Br. at 2-3.

However, as a tort-based system, the Vaccine Program must take petitioners as they are found. A prior injury should be taken into account if it is the focus of treatment,

---

[15] Dr. Ribault also stated that "past trauma can be associated with current symptoms as his shoulder did not necessarily heal after the trauma." Ex. 3 at 42. However, none of Petitioner's orthopedists indicated that the past gunshot wound had not healed properly.

13

but does not mandate an automatic discount. Respondent conceded entitlement and admits in his opening brief that Petitioner had "no recorded history of right shoulder pain or injury in the three years prior to vaccination." Resp't Br. at 2. Petitioner's gunshot wound and/or posture were not causing him any problems at the time of vaccination. Respondent does not provide any legal basis for the proposition that a mere history of a healed injury to the same arm can reduce the pain and suffering to be awarded for a new SIRVA injury.

Further, Respondent's contentions are not factually correct. Dr. Riley did not tell Petitioner, as Respondent asserts, that his shoulder would improve if he fixed his posture. *See id.* 3. Instead, Dr. Riley agreed to administer a cortisone shot, but stated that the cortisone shot alone, without any effort to correct his posture, would not provide much benefit. *See* Ex. 3 at 204. Dr. Riley did not suggest that Petitioner's pain was being caused by his poor posture. Respondent also ignores that Dr. Riley later noted that Petitioner had improved his posture and this issue was not focused on thereafter. *See* Ex. 7 at 139.

In a similar vein, Respondent examines Petitioner's MRI and surgical records and points to the post-operative diagnosis of chronic subacromial bursitis, severe AC osteoarthritis, synovitis of the glenohumeral joint, partial thickness rotator cuff tear, and degenerative fraying of the superior labrum. Resp't Resp. Br. at 3-4. Respondent argues that these findings "are more indicative of chronic conditions than an acute SIRVA." *Id.* However, this argument is misplaced and would go more to entitlement. As in *Amor*, where the petitioner also had osteoarthritis, "[w]hile Respondent is correct that [p]etitioner *had* co-morbidities," Respondent "has not established that they *contributed* to her pain . . . ."[16] 2024 WL 1071877, at *11 (emphasis in original). Contrary to Respondent's arguments here, none of Petitioner's treaters documented "multiple comorbidities" or found that natural aging and degenerative changes were "significantly contributing" to his pain. *See* Resp't Resp. Br. at 4.

Next, Respondent suggests that Petitioner himself is not credible. Respondent points to Dr. Ribault's initial assessment that Petitioner's pain was caused by a self-injury and later statement that Petitioner "had likely given himself a frozen shoulder." Resp't Br. at 8-9. Respondent further finds it suspicious that Petitioner began claiming an injury in his left shoulder and argues that this behavior "raises questions as to the motivation and reliability of the reporting." *Id.* at 9. Respondent bases this suspicion on the notes of a

---

[16] Respondent argues that in *Amor*, the Court made a "finding" that although the petitioner had co-morbidities, there was not enough evidence to show that they contributed to her pain. Resp't Resp. Br. at 4. Respondent asserts that here, by contrast, Petitioner's treaters made "findings" that he had "multiple comorbidities that significantly contributed to" his symptoms. *Id.* Neither of these propositions is correct. There was no "finding" about a lack of evidence in *Amor*. Instead, I rejected the same argument that Respondent makes here – the existence of a co-morbidity does not by itself demonstrate that it contributed to a petitioner's pain.

prison nurse, who remarked that Petitioner seemed to be an unreliable historian when discussing his left shoulder symptoms.

As stated above, I do not find that this case warrants an award in the $140,000.00 to $150,000.00 range. I do not give significant weight to Respondent's request for a significantly lower-than-usual award due to Petitioner's potential exaggeration of his symptoms when Respondent chose to concede entitlement. As a prison physician, Dr. Ribault appears to have had a high level of skepticism about his patients' complaints. Further, Petitioner has not filed any Vaccine Act claim for his left shoulder and if he does so, he will need to address these issues in the first instance, but they do not necessarily speak to the truthfulness of his earlier right shoulder complaints. I have considered the overall record and although I nevertheless accept the possibility that Petitioner could have been embellishing his symptoms, I also note that due to his incarceration, Petitioner waited long intervals between treatments and had some difficulties accessing interventions beyond a default conservative management through over-the-counter medications.

Finally, Respondent argues that an award greater than $100,000.00 would "incentivize petitioners to reject [R]espondent's full-value proffers, confident that the court will always award more." *Id.* at 7. Respondent asserts that "petitioners are now routinely declining to accept HHS's full value proffers," which creates more work for the court, Respondent, and "drives up attorney fees to be reimbursed by the Vaccine Program." *Id.* Respondent's concerns about the increased frequency of damages briefing and the court's workload are not factors to be considered in determining the value of a pain and suffering award. At bottom, *all* parties should be mindful of what awards the special masters issue – not what they believe are appropriate.

Overall, given the circumstances of this case, I find it appropriate to award $133,000.00 for pain and suffering.[17]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum payment of $133,000.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

---

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.